762 F.Supp. 844 (1991)
ELECTRO BATTERY MFG. CO. and Fireman's Fund Insurance Cos. Plaintiffs,
v.
COMMERCIAL UNION INSURANCE CO., Defendant.
No. 89-0297-C-5.
United States District Court, E.D. Missouri, E.D.
February 26, 1991.
*845 *846 Dennis C. Burns, Godfrey, Vandover & Burns, Inc., St. Louis, Mo., for plaintiffs.
Russell F. Watters, Brown & James, St. Louis, Mo., for defendant.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiffs Electro Battery Mfg. Co. ("Electro") and Fireman's Fund Insurance Cos. ("Fireman's") filed a one count complaint against defendant Commercial Union Insurance Co. ("Commercial Union") seeking declaratory relief and damages. Plaintiffs allege that Commercial Union is liable for damages resulting from a gap between Electro's primary and excess automobile insurance coverage. This action was tried before the Court on January 22, 1990. The Court, having considered the pleadings, testimony of witnesses, and documents admitted into evidence hereby makes the following findings of fact and conclusions of law as required by Fed.R.Civ.P. 52.

I. Findings of Fact

Electro is a corporation that distributes automobile and truck batteries. Daniel & Henry Co. ("Daniel") considers itself an insurance brokerage firm. Electro's insurance policies for primary and excess automobile liability insurance were issued through Daniel. Commercial Union is an insurance company which provided Electro with primary automobile insurance coverage. Mission Insurance Company ("Mission") is an insurance company which provided Electro with excess or umbrella automobile insurance coverage. Fireman's Fund is an insurance company which provided Daniel with coverage for errors and omissions.
There are approximately thirty insurers with which Daniel brokers can place insurance. Daniel is compensated with a commission paid by the insurers. In almost all cases the commission is a percentage of the insurance premium paid by the insured. Daniel has agency agreements with approximately 90% of the insurers with which it deals, including Commercial Union. The agency agreement governs the relationship between Daniel and the insurer. The brokers at Daniel complete applications for insureds. The broker has the authority to bind the insurer while the insurer considers the application of the prospective insured. The insurer, however, ultimately decides whether to issue insurance coverage to the applicant.
Commercial Union provided primary automobile liability insurance coverage to Electro between October, 1976 and June 30, 1981. For each annual period Commercial Union issued insurance policies to Electro which provided split liability coverage of $250,000 per person, $500,000 per occurrence, and $100,000 property damage ("250/500/100"). For the annual periods beginning July 1, 1979 and July 1, 1980, Mission provided excess coverage to Electro. Mission required Electro to have primary coverage $500,000 combined single limit ("500 CSL"), that is, for each accident Electro should have primary coverage of $500,000.00 regardless of the number of persons involved. Mission provided excess *847 coverage of $5,000,000.00 over and above an underlying 500 CSL.
At all times relevant to this action James Mangan was a commercial marketer with Daniel. Mr. Mangan was assigned the task of renewing Electro's account for the annual periods beginning July 1, 1979 and July 1, 1980. It was Mr. Mangan's intention for the annual period beginning July 1, 1979 to change Commercial Union's primary coverage of Electro to 500 CSL. As was stated, supra, prior to 1979 Commercial Union had issued automobile liability policies to Electro with the split coverage of 250/500/100. Mr. Mangan intended to notify Commercial Union of the change in coverage but failed to inform Commercial Union orally or in writing of the change. Therefore, Commercial Union renewed Electro's policy with the split coverage of 250/500/100. Mr. Mangan, however, indicated on Electro's application to Mission for excess insurance coverage that the underlying coverage issued by Commercial Union was going to change from 250/500/100 to 500 CSL.[1]
Mr. Mangan renewed Electro's policies for the annual period beginning July 1, 1980 on the same terms as for the previous annual period. Again, Mr. Mangan failed to inform Commercial Union either orally or in writing of any intended change in coverage from 250/500/100 to 500 CSL. Therefore, Commercial Union renewed the policy at 250/500/100. Mission renewed its excess coverage on the assumption that the underlying coverage was 500 CSL.
On December 3, 1980 Howard Kutermier, an employee of Electro, was involved in an automobile accident with Ricardo Gonzales, M.D.. Dr. Gonzales filed a lawsuit against Electro which was eventually settled for $300,000.00.[2] Commercial Union paid $250,000 toward the settlement. Mission refused to pay the $50,000 remainder because Mission was only liable for the amount of a settlement in excess of $500,000 under the terms of its policy with Electro. Fireman's Fund, which insured Daniel for errors and omissions, contributed the $50,000.00 necessary to settle Mr. Gonzales' case.
Nicholas Kontras, an insurance broker with Daniel, requested Mission to reform its insurance policy to close the gap. Mission refused. Mission was later declared to be insolvent. Fireman's Fund then demanded Commercial Union to reform its insurance policy to close the gap. Commercial Union also refused.

II. Conclusions of Law

Electro and Fireman's seek to hold Commercial Union liable for damages sustained due to the gap in coverage. First, Commercial Union may be liable for the gap because Commercial Union is directly at fault for the gap.[3] Second, Commercial Union may be liable for the gap because it is liable for the acts of Daniel, its alleged agent.

A. Is Commercial Union at fault for the gap?
It is clear that Daniel, not Commercial Union, is at fault for the gap in coverage. First, Commercial Union was not notified either orally or in writing, as required by the Agency Agreement between Daniel and Commercial Union, that Daniel sought to change Electro's primary coverage from 250/500/100 to 500 CSL. Second, Commercial Union did not receive information concerning Electro's excess coverage that would enable Commercial Union to detect the gap in coverage. In fact, Commercial Union was the only party that could not have discovered the gap in coverage. Daniel, Electro, and Mission received a declarations page from Commercial Union and Mission which set forth the coverage each provided. If Daniel, Electro, or Mission compared the policies, they would have discovered a gap. Commercial Union, *848 however, did not receive a declarations page from Mission and therefore did not know the terms of the excess coverage provided by Mission. Third, as was stated in Lazzara v. Howard A. Esser, Inc., 802 F.2d 260, 266 (7th Cir.1986) (applying Illinois law), "[a]n insurer ... does not have the duty of reviewing the adequacy of an insured's coverage, even when it knows of facts that indicate that the coverage is inadequate." Therefore, Commercial Union was not at fault in renewing its coverage of Electro at 250/500/100 even though renewal on those terms resulted in a gap between primary and excess coverage.
The fault for the gap lies squarely in the lap of Daniel. It is well settled that an insurance agent or broker who undertakes to procure insurance for a client owes an obligation to act with reasonable care, skill, and diligence. Bell v. O'Leary, 744 F.2d 1370, 1372 (8th Cir.1984) (interpreting Missouri law); Chandler v. Jones, 532 So.2d 402, 405 (La.App.1988); DiLorenzo v. Edward Holle Insurance Agency, 735 F.Supp. 571, 573 (S.D.N.Y.1990). Daniel failed to exercise reasonable care, skill, and diligence in two ways. First, Mr. Mangan failed to notify Commercial Union, either orally or in writing, of the desired change in insurance coverage. Second, it is Daniel's policy to compare a client's underlying and excess insurance coverage to insure that the coverage of both policies was issued as intended. Mr. Mangan does not recall performing the comparison. If Mr. Mangan or any other employee at Daniel would have conducted this comparison, they could have discovered and remedied the gap.

B. Is Commercial Union liable for the negligence of Daniel?
Plaintiffs seek to hold Commercial Union liable for the negligence of Daniel. Plaintiffs assert that Daniel is the agent of Commercial Union and that Commercial Union, as principal, is liable for Daniel's negligence. Defendant, however, asserts that Daniel is the agent of Electro.
To determine whether Daniel was the agent of Commercial Union, the Court must first characterize Mr. Mangan as an insurance agent or insurance broker. Daniel considers itself an insurance brokerage firm, and Mr. Mangan an insurance broker. However, it is the acts of the person, and not what he calls himself, that determine whether he is a broker or an agent. 16 J. Appleman Insurance Law and Practice § 8726 (1981). An insurance broker is an independent middleman not tied to a particular insurance company. The insurance broker may shop around for the insured to obtain the most favorable terms from competing insurance companies. Id. at § 8725. The insurance agent, however, is captive to one insurance company and is bound to place insurance with that company. Id.
In the instant matter it is clear that Mr. Mangan was an insurance broker rather than an insurance agent. Although Daniel had placed Electro's primary automobile liability insurance with Commercial Union since 1976, Daniel placed insurance with approximately 30 insurance companies and Mr. Mangan was free to switch insurers if another insurer offered Electro better terms for its coverage.
The general rule is that the insurance broker is the agent of the insured. However, whether an insurance broker is the agent of the insurer or of the insured depends on the facts of the particular case. Schimmel Fur Co. v. American Indemnity Co., 440 S.W.2d 932, 938 (Mo.1969). The broker may be the agent of just one, or he may be the agent of the insurer for a certain purpose and of the insured for another purpose. Id. For example, the broker acts for the insured for the purpose of making the application and procuring the policy, and for the insurer for the purpose of collecting and remitting the premiums and delivering the policy. Couch on Insurance 2d § 25:94 (1984). Even though a broker is generally the agent for the insured, it has been recognized that special conditions or circumstances in a particular case may warrant a fair inference that the broker is the agent of the insurer. Schimmel Fur Co., supra, 440 S.W.2d at 938. The Court's inquiry, therefore, is whether special conditions or circumstances exist in *849 this matter which warrant a diversion from the general rule.
Daniel executed agency agreements with most of the insurance companies with which Daniel placed insurance. The Agency Agreement between Daniel and Commercial Union, which was in effect at all times relevant to this action, provided in relevant part:
In consideration of the mutual covenants and agreements herein contained, the undersigned Companies and Agent (herein designated as Company and Agent, respectively) hereby agree as follows:
(1) Company appoints the Daniel and Henry Co. as Agent in the following territory: St. Louis, Missouri, and vicinity (but not to the exclusion of other Agents) with authority to receive and accept proposals for such contracts of insurance (including bonds) as Company and Agent have authority lawfully to make; subject, however, to the restrictions placed upon Agent by laws of the State or States in which Agent is authorized to write business and to the terms and conditions set forth herein and to the instructions of Company to Agent.
* * * * * *
(4) Agent agrees to notify Company in writing of all Endorsements, Certificates and Contracts of Insurance accepted not later than the fifth working day, and all binders accepted not later than the third working day of coverage, which ever occurs first.
Plaintiff asserts that under the Agency Agreement Daniel had authority to accept proposals for insurance contracts and to issue binders accordingly. Plaintiff further asserts that Daniel had the authority to bind Commercial Union to the change in policy limits from 250/500/100 to 500 CSL. Therefore, under the terms of the Agency Agreement Daniel was the agent of Commercial Union when Mr. Mangan renewed the Electro's policy, and Commercial Union is liable for Mr. Mangan's negligence in renewing the policy on terms leaving a gap in coverage.
Plaintiff cites as support for its position Schimmel Fur Co. v. American Indemnity Co., supra, and Travelers Indemnity Co. v. Beaty, 523 S.W.2d 534 (Mo.App. 1975). In Schimmel Fur Co., plaintiff was a fur merchant. Plaintiff placed his insurance through Mr. Lee Kling, vice president of the insurance brokerage firm General Insurors, Inc.. In 1963 plaintiff opened a second place of business. Plaintiff contacted Mr. Kling, and requested that Mr. Kling purchase insurance against loss by burglary for the new location. Mr. Kling assured plaintiff that the new premises would be covered by an amendment to the existing policies.
The new location contained two back rooms: a large room called the "vault" and a smaller room called the "stockroom". It was plaintiff's intention to insure the stockroom for $22,500.00 and the rest of the premises for $2,500.00. Mr. Kling, however, inadvertently insured the vault for $22,500.00 and the rest of the premises for $2,500.00. In October, 1964 plaintiff sustained a substantial loss when the stockroom room was burglarized. Plaintiff then discovered that the limit of insurance coverage for the loss was only $2,500.00. Although Mr. Kling was an insurance broker, the Court concluded that Mr. Kling acted as the agent of the insurer when he purchased the insurance for plaintiff's new location. The court stated:
The evidence shows that this is not a case where an independent broker is given an order to procure insurance in any company he may choose. Instead, there is evidence from which it could be found that, irrespective of any previous brokerage performed by Kling for plaintiff, an arrangement was made on this occasion between plaintiff and Lee Kling as vice-president of General Insurors, Inc., that an existing policy of insurance ... should be extended to include plaintiff's new store, and the arrangement was confirmed when Kling notified plaintiff that the new store when opened would be covered as desired by plaintiff. That Kling, as vice-president of General Insurors, was [the insuror's] actual or apparent agent at the time of the confirmation, *850 was supported on the record. The existing policy had been in effect for over a year and it bore the stamp, "General Insurors, Inc.," as authorized representative of [the insuror] with knowledge and authority of [the insuror]; Lee Kling was known by plaintiff to be a vice-president of General Insurors, Inc., and all previous Schimmel insurance had been placed by Kling through General. These circumstances reasonably permitted plaintiff to assume that Kling had authority when he recommended extending the existing policy and called to confirm plaintiff's desired coverage would be accomplished in that manner; and a principal who places an agent in such a situation that a person of ordinary prudence is justified in presuming that the agent has authority to perform a particular act on the principal's behalf is estopped from denying such authority as against such innocent third person.
440 S.W.2d at 938. The Court permitted the insurance contract to be reformed to conform to the parties' agreement. Id. at 939.
In Travelers Indemnity Co., the Court held that an insurance broker possessed apparent authority to bind an insurance company to immediate coverage despite the terms of the policy which delayed the commencement of coverage. Mr. Beaty, the insured, purchased automobile coverage with Travelers, the insurer, through the Ogle Insurance Agency, an insurance broker. On July 30, 1987 Belva Beaty, the wife of the insured, purchased from Travelers additional coverage through Ogle for a tandem. On July 30, 1987 Mrs. Beaty paid to Ogle the premium for the additional insurance coverage. The application stated that coverage was to commence on August 1, 1970. On the back of the application Mr. Ogle responded "yes" to the question of whether coverage was bound. Mr. Ogle also assured Mrs. Beaty that coverage was effective as of July 30, 1970.
On July 31, 1970 the tandem was involved in a collision with a bridge owned by the Missouri State Highway Commission. The Missouri State Highway Commission sued the Beatys for damage to the bridge and received an award of $27,000.00. Travelers refused to provide coverage for the Beatys because the effective date of coverage for the policy, both by the application and endorsement, was August 1, 1970. The Court held that the following circumstances demonstrated apparent authority on behalf of Ogle to bind Travelers to immediate coverage on July 30, 1970: (1) Ogle had earlier bound coverage in Travelers for Beaty on the application for the original policy; (2) the application form furnished by Travelers contained the question: "Has coverage been bound?" to which Ogle responded "yes"; (3) Ogle verbally assured Mrs. Beaty that coverage was bound on July 30, 1970. 523 S.W.2d at 538.
An agency relationship between Commercial Union, as principal, and Daniel, as agent, may arise from Commercial Union's granting Daniel either actual or apparent authority. The Agency Agreement between Commercial Union and Daniel, which is a source of actual authority, provided Daniel with the authority to accept proposals for insurance contracts and to issue binders accordingly. Therefore, Daniel had the authority to bind Commercial Union to the change in policy limits from 250/500/100 to 500 CSL until Commercial Union renewed or rejected the policy. The issuance of a binder creates a temporary or preliminary contract of insurance that is effective from the date of the binder until (1) the issuance of the formal policy, or (2) rejection of the risk by the insurer. 12A Appleman Insurance Law and Practice § 7227 (1981). The binder does not constitute a part of an insurance policy, nor does it create any rights for the insured other than during its effective period. Id.
In Travelers Indemnity Co. the court concluded that the insured paid her premium for coverage on July 30, 1970 and coverage commenced on that date, in accordance with the written and oral statements of the broker, despite the fact that the application was post dated August 1, 1970. The insured was covered on July 30, 1970 because the broker had either actual or apparent authority to bind, and the accident *851 occurred during the period which the insurer was bound by the actions of the broker. In Travelers Indemnity Co., the broker's authority to bind was relevant because the loss occurred before the policy was issued by the insurer. In the instant matter the accident did not occur while the binder was in effect. Instead, the accident occurred after Commercial Union renewed the policy with the split coverage of 250/500/100. The grant of a power to bind creates actual authority for the broker to act on behalf of the insurer while the binder is in effect. The authority to bind, however, does not make the insurer liable for the negligence of the broker after the policy has been accepted or rejected by the insurer and the insured is notified of the terms on which the policy was issued. Therefore, the Court does not consider the Commercial Union's granting Daniel the power to bind a special circumstance which persuades the Court to disregard the general rule in this matter.
An agency relationship between Commercial Union and Daniel can also arise from apparent authority. Apparent authority is created when a principal places an agent in such a situation that a person of ordinary prudence is justified in presuming that the agent has authority to perform a particular act on the principal's behalf. In Schimmel Fur Co. the Court concluded that the broker had apparent authority to act on behalf of the insurer when it extended the coverage of the insured to include the new store. First, the broker extended an existing policy to provide additional coverage for the insured pursuant to an arrangement between the insured and the broker. Second, the broker contacted the insured and confirmed that the new store would be covered as desired by plaintiff. Third, the insurance policy bore the stamp of the broker which identified the broker as the authorized representative of the insurer.
Plaintiffs assert, as a source of apparent authority, that it is the standard practice in the insurance industry with respect to policy renewals to afford brokers discretion in increasing policy limits. Absent extraordinary circumstances, such increases are accepted by insurers. This is especially true when, as in the instant matter, the insurer had provided insurance coverage for the insured for several years and was familiar with the account. The Court has considered whether this "industry practice" is a source of actual or apparent authority and concludes that it is not. First, Commercial Union did not grant Daniel the actual authority to increase or change policy limits on renewal insurance contracts. Instead, for renewals Daniel was only granted the actual authority to accept a proposal and issue a binder which was effective until Commercial Union either accepted or rejected the risk.
Second, Commercial Union did not grant Daniel apparent authority to increase or change policy limits on renewal insurance contracts. Although plaintiffs call the policy an industry practice, there is no evidence that the industry practice was in place at Commercial Union. It is assumed that Commercial Union would have changed the policy limits to 500 CSL if Mr. Mangan had properly notified Commercial Union of the desired change. However, unlike in Schimmel Fur Co. there is no evidence of any assurances by Mr. Mangan to Electro that Commercial Union had renewed the policy at 500 CSL. There is no evidence of any assurances by Mr. Mangan to Electro that Commercial Union's acceptance of a renewal at 500 CSL was merely pro forma. Also, unlike in Schimmel Fur Co. there was no stamp or other representation to Electro that Daniel was the authorized agent of Commercial Union. Instead, the Commercial Union's policy merely identifies Daniel as an insurance broker.
The Court's focus for apparent authority is on the actions of Commercial Union, the alleged principal. Commercial Union renewed the policy on the terms requested by the insurance broker. Although the broker intended to change the terms on which the policy was renewed, the broker did not communicate this intention to the insurance company, and did not detect the error after the policy was renewed. The Court concludes that plaintiff has set forth no reason to deviate from the general rule that the *852 broker is the agent for the insured. Therefore, Commercial Union cannot be held liable for the negligent acts of Daniel in renewing Electro's insurance policy because Daniel was the agent of Electro.

C. Reformation
Plaintiffs seek for Commercial Union to reform its policy for the annual period beginning July 1, 1989 to provide primary coverage to Electro of 500 CSL instead of 250/500/100. The remedy of reformation is applicable to insurance contracts. Williams v. United Ins. Co., 618 S.W.2d 229, 231 (Mo.App.1981) (citing Peterson v. Commonwealth Casualty Company, 212 Mo.App. 434, 249 S.W. 148, 150 (1923)). A written instrument which does not conform to the contract agreed to by the parties will be reformed in equity to reflect the contract agreed to. Id. (citing St. Louis County National Bank v. Maryland Casualty Company, 564 S.W.2d 920, 924 (Mo.App.1978)). The party seeking reformation has the burden to establish by clear and convincing evidence that a mutual mistake common to both parties has been made. It must be clear that the instrument has done what neither party intended. Id.
Commercial Union, as insurer, was a party to the insurance contract that plaintiffs seek to reform. Commercial Union, however, renewed in accordance with the instructions of Daniel. Although Daniel intended to notify Commercial Union of changes in the policy limits, Daniel failed to communicate this information to Commercial Union orally or in writing and Commercial Union renewed the policy with the prior policy limits. Because Commercial Union intended to renew the policy with the split coverage of 250/500/100, Commercial Union made no mistake warranting reformation of the contract.
Although Electro and Daniel each intended the contract to be renewed with coverage of 500 CSL, no mutual mistake exists because Daniel was the agent of Electro. When a broker is not the agent of the insurer, the broker's mistake is not chargeable to the insurer. Accordingly, the insurer does not act under a mutual mistake when it issues a policy in accordance with the broker's mistaken direction. Couch on Insurance 2d § 66:47 (1983).
Under Missouri law a court may grant equitable relief when a party to a contract makes a unilateral mistake. Sheinbein v. First Boston Corporation, 670 S.W.2d 872, 876 (Mo.App.1984). The elements necessary for a Court to grant relief in the event of a unilateral mistake include:
(1) the opposing party must possess knowledge of the unilateral mistake or the mistake must be of such nature that it should have been known by the opposing party,
(2) the unilateral mistake must concern a vital matter so that the court could conclude that the parties never actually agreed to the contractual elements, and
(3) the party seeking rescission must act promptly on discovering the reason and need for rescission.
Id. The Court declines to reform the policy on the ground of unilateral mistake. Commercial Union, the opposing party, had no knowledge of the unilateral mistake at the time it renewed the policy with split coverage of 250/500/100. Furthermore, the mistake was not of such a nature that Commercial Union should have been aware of it. Electro had purchased policies from Commercial Union for several years with split coverage of 250/500/100. Also, Commercial Union was not apprised of the excess coverage carried by Electro and had no reason to believe that a renewal with split coverage would create a gap.
For the foregoing reasons, the Court enters judgment in favor of defendant and against plaintiff on the merits of plaintiff's complaint.
NOTES
[1] Although a gap in Electro's coverage existed for the annual period beginning July 1, 1979, the gap was not detected because no losses were claimed on the policy.
[2] The parties agree that the $300,000.00 paid to settle Dr. Gonzales' claim was fair and reasonable.
[3] The Court will address this argument even though plaintiffs do not expressly assert it.