#24078-a-MILLER, Retired Justice

**2007 SD 55**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

NORTH STAR MUTUAL
INSURANCE COMPANY,                                     Plaintiff and Appellee,

v.

GLENN L. RASMUSSEN,                                    Defendant and Appellant,
   and
KEITH O. RASMUSSEN, AUTO-
OWNERS INSURANCE COMPANY,
BRUNSWICK CORPORATION, a Delaware
Corporation, MERCURY MARINE, a division
of Brunswick Corporation, and CROWNLINE
BOATS, INC., an Illinois Corporation,                  Defendants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA
\* \* \* \*

HONORABLE WILLIAM J. SRSTKA, JR.
Judge

\* \* \* \*

MICHAEL J. SCHAFFER of
Schaffer Law Office, Prof., LLC
Sioux Falls, South Dakota                              Attorney for appellee.

WILLIAM FULLER of
Fuller & Sabers, LLP
Sioux Falls, South Dakota                              Attorneys for appellants.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MARCH 19, 2007

OPINION FILED **06/13/07**

#24078

MILLER, Retired Justice

[¶1.] North Star Mutual Insurance Company initiated a declaratory judgment action against Glenn L. Rasmussen seeking a ruling that North Star had no duty to defend or indemnify Rasmussen under an umbrella policy. Each party filed motions for summary judgment. The trial court concluded there was no coverage under the umbrella policy and granted North Star's motion. It held that North Star had no duty to defend claims against Rasmussen. Rasmussen appeals. We affirm.

## FACTS AND PROCEDURAL HISTORY

[¶2.] Mary Henkel is an insurance agent employed through the Puthoff Insurance Agency at its branch office, The Insurance Store, located in Howard, South Dakota. She was licensed as an insurance agent by the State of South Dakota on May 1, 1984. North Star appointed Henkel as one of its agents on March 7, 1989. Her employer, Puthoff, and North Star had entered into an Agency Agreement in which Puthoff and its agents were allowed to solicit and negotiate insurance on behalf of North Star.

[¶3.] On April 8, 2000, Rasmussen purchased a 2000 Crownline boat. Shortly thereafter, he asked Henkel to acquire insurance coverage on the Crownline. She had acquired insurance for Rasmussen on numerous occasions in the past.[1] Under their arrangement, Rasmussen would inform Henkel of the

---

1. Rasmussen testified that he and Henkel were good friends; they had worked together in his insurance business, the Rasmussen Agency, in the past; and Henkel had been his agent since the mid 1980s. When they worked together,

(continued . . .)

-1-

property he wished to have insured, and she would decide, according to Rasmussen's various insurance needs, what type of insurance to obtain and the company with which to place the insurance.

[¶4.] Over the course of their relationship, Henkel obtained coverage for Rasmussen from various companies. For instance, in 1990, she acquired a homeowner's insurance policy for him with North Star, and in 1991, a Personal Liability Umbrella Policy (umbrella policy) also through North Star. However, Henkel acquired liability coverage on Rasmussen's automobiles and the Crownline through Auto-Owners Insurance Company. According to Henkel, she had about six different companies from which to select umbrella coverage.

[¶5.] Although Henkel had the authority to solicit insureds for North Star, she did not have authority to bind North Star to an umbrella policy. She would merely submit an application on behalf of potential insureds.[2] However, North Star identified Henkel as "Our Authorized Representative" on the umbrella policy. This language was underneath Henkel's signature. Rasmussen paid the premiums on his policies directly to North Star. Then, North Star made commission payments to Puthoff based on policies acquired by its agents. Puthoff then paid Henkel.

_____

(. . . continued)
Rasmussen sold life insurance and Henkel sold property and casualty insurance.

2. At one time, North Star denied an application for insurance submitted by Henkel on behalf of Rasmussen. She notified Rasmussen of this denial. Thus, he was aware that Henkel lacked the authority to bind North Star to a policy prior to its approval.

[¶6.] On April 10, 2000, Rasmussen completed an application for boat insurance seeking liability coverage for the Crownline in the amount of $500,000. The application completed by Rasmussen and signed by Henkel correctly stated the horsepower of the Crownline as 300. Rasmussen does not recall whether, at this time, he specifically requested that Henkel obtain both liability and umbrella coverage on the Crownline. Henkel admits to knowing that he wanted both coverages. Although Henkel obtained underlying liability coverage on the Crownline from Auto-Owners, she did not specifically obtain umbrella coverage by either adding the Crownline to the umbrella policy currently in place with North Star or by procuring separate umbrella coverage from one of the other insurance companies for which she was authorized to solicit insurance.

[¶7.] North Star routinely submitted personal umbrella renewal questionnaires to agents and insureds who currently possessed umbrella coverage with it. On January 10, 2001, both Henkel and Rasmussen signed the personal umbrella renewal questionnaire issued by North Star concerning Rasmussen's policy. In that renewal questionnaire, immediately above their signatures, was a list of the underlying policies covered by the North Star umbrella policy currently in effect. That list did not include the underlying policy from Auto-Owners on the Crownline. Rather, it contained only the home and auto underlying policies.

[¶8.] On August 12, 2001, Rasmussen and his son, Keith, were involved in a boating accident with the Crownline. When Rasmussen reported the accident to Henkel, she informed him that the Crownline had not been added to the North Star umbrella policy, so there was no coverage under that policy. However, Henkel later

sent a letter to North Star questioning why the Crownline was not added to Rasmussen's umbrella policy. This was the first time North Star was aware that Rasmussen owned the Crownline.

[¶9.] On September 28, 2001, Henkel requested that the Crownline be added to the North Star umbrella policy. Although aware of the August 12, 2001, accident at this time, she did not so inform North Star. Also, she misinformed North Star of the size of the Crownline's motor by incorrectly stating that it had a 135 horsepower inboard/outboard motor rather than a 300 horsepower motor.[3] Based upon the information provided by Henkel, North Star agreed to provide umbrella coverage on the boat effective October 4, 2001. It billed Rasmussen for the full annual premium of $25 for this added coverage.

[¶10.] As a result of the August 12, 2001, accident, Rasmussen's son, Keith, suffered severe injuries and filed suit against his father, alleging that he negligently operated the Crownline at the time of the accident. The damages sought exceeded the policy limits of Rasmussen's underlying insurance with Auto-Owners; therefore, Rasmussen sought coverage under his North Star umbrella policy.

[¶11.] North Star denied coverage, claiming the watercraft exclusion in the umbrella policy precluded coverage, because the underlying Auto-Owners policy on

---

3. Notably, North Star's underwriting rules do not allow umbrella coverage for boats with motors in excess of 250 horsepower without first obtaining approval from its reinsurer.

#24078

the Crownline was not added to the declarations page in the umbrella policy. North Star filed an action seeking declaratory relief. Both parties filed motions for summary judgment.

[¶12.]    The trial court granted North Star's motion for summary judgment. The court concluded there was no coverage on the Crownline under the umbrella policy in effect at the time of the accident and that Henkel was Rasmussen's agent rather than North Star's; therefore, any negligence or fault of Henkel in procuring umbrella coverage on the Crownline was not imputed to North Star.

[¶13.]    Rasmussen appeals, raising two issues:

1.    Whether the North Star umbrella policy provides coverage for the accident on August 12, 2001.

2.    Whether Henkel was North Star's agent for purposes of imputing her negligence to North Star.

## STANDARD OF REVIEW

[¶14.]    Our standard of review for summary judgment is well established: In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we determine whether the moving party has demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. When reviewing a grant of summary judgment, we must undertake an independent review of the record. The burden of proof is upon the movant to show clearly that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law.

Rumpza v. Donalar Enterprises, Inc., 1998 SD 79, ¶9, 581 NW2d 517, 520 (internal citations and quotations omitted).

## ANALYSIS AND DECISION

[¶15.] **1. Whether the North Star umbrella policy provides coverage for the accident on August 12, 2001.**

[¶16.] Rasmussen argues that North Star effectively backdated umbrella coverage on the Crownline to the beginning of the policy period (February 2001) when, in October 2001, it charged Rasmussen the full $25 annual premium. North Star, however, claims that Rasmussen was charged the full annual premium for four months of coverage according to North Star's standard billing policies.

[¶17.] According to North Star's billing policies, if a new risk is added to an umbrella policy that is already in place within ten months after a renewal, a flat rate is charged and the premium is not prorated. However, if the new risk is added within the two-month period before the umbrella policy is up for renewal, there is no premium charged for the added risk. The existing umbrella policy was renewed on February 6, 2001 and would not be up for renewal until February 6, 2002. Rasmussen sought to add the Crownline to the existing policy on October 4, 2001. Because this was within ten months of the renewal date of February 6, 2001, North Star charged Rasmussen the full $25 premium, despite the fact that only four months of coverage would be provided.

[¶18.] Rasmussen claims that by accepting his $25 premium, North Star voluntarily backdated coverage to February 6, 2001, and thus assumed coverage for any obligation from the accident occurring on August 12, 2001. Rasmussen relies on *Trefethen v. New Hampshire Ins. Group* as authority supporting his argument

for retroactive application. 645 A2d 72, 75 (NH 1994). However, in *Trefethen*, the agent specifically requested "comprehensive general liability coverage retroactive to October 30, 1987," a date prior to the accident, and the insurance company voluntarily agreed to provide retroactive coverage. *Id*. at 73. Thus, the *Trefethen* court concluded there was "no reason effect should not be given to [the insurance company's] voluntary backdating of comprehensive coverage." *Id*. at 75.

[¶19.]     In this case, Henkel never requested and North Star never agreed to provide retroactive coverage. According to the general rule, "an insurer is liable for a loss under a backdated policy only when the loss occurs between the time the policy became effective and the time the policy is issued, and both the insured and the insurer are ignorant of the loss when the policy is issued." Dodds v. Hanover Ins. Co., 880 SW2d 311, 314 (Ark 1994) (citations omitted). Further, "if the insured knows of the loss at the time the insurance is effected but the underwriters are ignorant of the loss, the insurer is not liable." *Id*.

[¶20.]     Here, both Rasmussen and Henkel knew of the accident when North Star allegedly provided coverage; however, neither informed North Star. Under these facts, we conclude that North Star did not voluntarily backdate coverage to February 1, 2001, by accepting Rasmussen's $25 premium on October 4, 2001.

[¶21.]     Rasmussen also contends that the watercraft exclusion in the umbrella policy is ambiguous, thus it does not bar coverage on the boat. North Star's umbrella policy provides:

> We do not cover:
> 2. The ownership, operation, maintenance, use, occupancy, renting, loaning, entrusting, supervision, loading or unloading of any . . .

(a) motorcycle;
(b) "recreational vehicle";
(c) watercraft; or
(d) "automobile."

However, the umbrella policy further provides that "[t]his exclusion does not apply to a vehicle covered by 'underlying insurance.'" The definition of "underlying insurance" provided in the umbrella policy states in relevant part:

> 16. 'Underlying Insurance' means the liability insurance coverage provided under policies shown in the Declarations for the 'limits' and periods indicated in those policies. With respect to the policies shown in the Declarations, the 'limits' shall be conclusively deemed to be the minimum applicable policy 'limits.' Underlying Insurance includes any policies issued to replace those policies during the policy period of this insurance.

On the date of the accident, the schedule of underlying insurance on the declarations page of the umbrella policy did not include the underlying insurance issued by Auto-Owners on the Crownline.

[¶22.] Rasmussen argues that this exclusion is ambiguous as to whether the underlying insurance has to be listed in the declarations within the umbrella policy or in the declarations within the underlying policy. Other courts that have addressed similar policy language have determined that the exclusion is not ambiguous as it clearly requires the underlying policy be listed in the umbrella policy declarations. *See* Evins v. Louisiana Farm Bureau Mut. Ins. Co., 907 So2d 733, 736 (LaApp 2005); Am. Res. Ins. Co. v. H & H Stephens Constr., Inc., 939 So2d 868, 874 (Ala 2006).

[¶23.] In *Evins*, the umbrella policy stated in relevant part, "[e]xcept to the extent that coverage is available to the insured in the underlying policies as stated in the schedule of underlying insurance, this policy does not apply . . . ." 907 So2d

at 735. However, the insured's policy that provided underlying coverage for the automobile in dispute was not listed in the schedule of underlying insurance within the umbrella policy. *Id.* at 736. Thus, the *Evins* court concluded that "since the umbrella policy only provides coverage for damages sustained in excess of the policies listed on the schedule of underlying insurance, and the [underlying] policy is not listed on the schedule of underlying insurance, there is no coverage under the umbrella policy for the damages sustained . . . ." *Id.* Finally, the court concluded there was no reasonable interpretation of the umbrella policy under which coverage could be afforded. *Id.*

[¶24.] Similarly, in *American Resources Insurance Co.*, the umbrella policy contained language prohibiting coverage unless coverage was provided in "underlying insurance." 939 So2d at 871. "The definitions section of the umbrella policy define[d] 'underlying insurance' as 'the coverage(s) afforded under insurance policies designated in Item 7 of the Declarations and any renewals or replacements of those policies.'" *Id.* The applicable underlying insurance policy was not listed within the "Declarations" in the umbrella policy. *Id.* In denying coverage, the Alabama Supreme Court concluded:

> [F]or the umbrella policy to apply to the claims . . . , the umbrella endorsement *unambiguously* required H & H Stephens (1) to have had a separate policy on the automobile Gilmore was driving at the time of the accident, and (2) to have had that separate policy listed in Item 7 of the declarations section of the umbrella policy. H & H Stephens complied with the first condition; the automobile driven by Gilmore was covered by the Canal policy. But because the Canal policy is not designated in Item 7 of the declarations section of the umbrella policy, H & H Stephens did not satisfy the second condition.

*Id.* at 874-875 (emphasis added).

[¶25.] Rasmussen hinges his argument on the deposition testimony of Rose Wisdorf, a North Star assistant commercial casualty underwriter. Wisdorf testified as follows:

> Q: And if you look at page 2, under the definition section, number 16, that defines underlying insurance, does it not?
> A: Yes.
> Q: And it means liability insurance coverage provided under policies shown in the declarations for the limits and periods indicated in those policies, right?
> A: That's what it says, yes.
> Q: Okay. The declarations, in that sentence where the word 'declarations' is used, is that the declaration page of the North Star policy or the declaration page of the underlying policy?
> A: I don't know.

Rasmussen claims this testimony demonstrates that the exclusion is ambiguous.

[¶26.] Although Rasmussen seeks to create an ambiguity by the deposition testimony of Wisdorf, the issue of whether a contract is ambiguous is a question of law. Ziegler Furniture & Funeral Home, Inc. v. Cicmanec, 2006 SD 6, ¶14, 709 NW2d 350, 354 (citation omitted). Thus, "[t]his Court need only look to the language that the parties used in the contract to determine their intention." *Id.* ¶16, 709 NW2d at 355 (citation omitted). "[I]f the contract is clear and unambiguous, its interpretation is for the court, and not for the parties, even though the parties by their acts may have evidenced a construction differing from that evidenced by the written instrument." Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 21:7 (3d ed 1996); *see also*, Vega v. Shelter Mut. Ins. Co., 162 SW3d 144, 150 (MoApp 2005).

[¶27.] Rasmussen further asserts that "'[a]n insurer . . . may be estopped in reference to the meaning of a particular term in one of its contracts by its own

interpretation of that term.'" *Donalar Enterprises, Inc.*, 1998 SD 79, ¶14, 581 NW2d at 521 (quoting Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 21:8 (3d ed 1996)). However, the cases supporting this principle differ in great respects from the case before us. For example, in *Donalar Enterprises, Inc.*, the president of the insurance company testified to the meaning of a provision that was clearly ambiguous, for there was no reference in the policy to the meaning of the provision. *Id.* Thus, his testimony controlled the meaning of the term. *Id.*

[¶28.] Also, in *American Republic Life Ins. Co. v. Flynn*, the case cited in *Couch on Insurance*, the vice president of the insurance company wrote a letter to the insured giving the company's interpretation of a rider on the insured's policy. 238 SW2d 937, 938 (Ark 1951). Here, an underwriting assistant simply answered, "I don't know" to a question in her deposition concerning the meaning of policy language. She did not offer her interpretation of a specific term like the previous cases, and she is not in a position of president or vice president of the company. Thus, North Star is not estopped by the testimony of Wisdorf.

[¶29.] Were we to read the policies' terms and definitions as Rasmussen suggests, we would be inappropriately providing the policies with a "strained and unusual meaning." *See* Nat'l Sun Indus., Inc. v. South Dakota Farm Bureau Ins. Co., 1999 SD 63, ¶19, 596 NW2d 45, 49 (citations omitted). When the umbrella policy is read as a whole, it would be an absurd interpretation to hold "Declarations" to mean the declaration page on any underlying insurance policy the insured may own. That interpretation would render the "Declarations" in the umbrella policy meaningless, because the declaration pages in the underlying policies of the insured

would control which losses were covered. In effect, the umbrella insurance provider would not be aware of the underlying insurance policies for which it was providing excess coverage.

[¶30.] Therefore, we conclude that the North Star watercraft exclusion is unambiguous. The umbrella policy clearly required that the underlying policies covered by the umbrella policy be listed in the "Declarations" within the umbrella policy itself. Because Rasmussen's underlying insurance policy with Auto-Owners covering the Crownline was not listed in the "Declarations," it is not covered by the umbrella policy.

[¶31.] **2. Whether Henkel was North Star's agent for purposes of imputing her negligence to North Star.**

[¶32.] Rasmussen claims that if the umbrella policy does not provide coverage for the Crownline, North Star is nevertheless responsible for providing coverage for the accident, submitting that Henkel was North Star's agent. He thus argues that any negligence, fault or knowledge of Henkel in procuring umbrella coverage is imputed to North Star. North Star asserts that Henkel is the agent of Rasmussen rather than North Star.

[¶33.] We examine this issue under both statutory and general agency law. First, we review the applicable statutes concerning agency, and the trial court's interpretation of those statutes. Rasmussen argues that SDCL 58-30-142 and 58-30-176, which became effective on July 1, 2001, apply because they were enacted prior to the date of the accident, and they apply retroactively. North Star, on the other hand, claims SDCL 58-1-2 applies because it was in effect when Henkel failed to procure the umbrella policy in 2000. Because Rasmussen claims North Star is

responsible for Henkel's failure to procure umbrella coverage when he reported the purchase of the boat in April 2000, North Star argues that the statute in effect at that time applies because that was the time of the claimed negligent act.

[¶34.]     SDCL 58-1-2(1) (repealed 2001) defined agent as "any individual, firm, or corporation licensed by the director and if authorized by an insurer to solicit, negotiate, issue, countersign, and effectuate insurance contracts." It defined broker as "any person, partnership, association, or corporation, which acts or aids for or on behalf of the assured in any manner, with or without compensation, in the solicitation or negotiation of policies or contracts for insurance covering property or risks in this state." SDCL 58-1-2(4) (repealed 2001).

[¶35.]     However, in 2001, by a statute which went into effect six weeks before the boating accident, the legislature repealed the above definitions and enacted a new statute that defines "[a]gent of the insurer" as "any insurance producer who is compensated directly or indirectly by an insurer and sells, solicits, or negotiates any product of that insurer" and "[a]gent of insured" as "any insurance producer or person who secures compensation from an insured or insurance customer only and receives no compensation directly or indirectly from an insurer for a transaction with that insured or insurance customer." SDCL 58-30-142(1)(2). This statute is not located within the general definitions section of the Insurance Title as were the previous definitions. Rather, it is placed within the section concerning insurance producers and applies to "[t]erms used in §§ 58-30-141 to 58-30-195, inclusive." *Id.*

[¶36.]     Because the issue is whether Henkel's claimed negligence in failing to procure insurance is imputed to North Star, we must determine whether Henkel

was acting as North Star's insurance agent at the time she failed to procure insurance. Thus, we must apply the law in effect at that time. We therefore hold that SDCL 58-30-142 and 58-30-176 do not control.

[¶37.]    Rasmussen alternatively argues that SDCL 58-30-176 establishes that the definitions within SDCL 58-30-142 apply retroactively. SDCL 58-30-176 provides:

> To appoint an insurance producer or business entity as its agent, the appointing insurer shall file, in a format approved by the director, a notice of appointment within fifteen days from the date the agency contract is executed or the first insurance application is submitted. An insurer may also elect to appoint an insurance producer to all or some insurers within the insurer's holding company system or group by the filing of a single appointment request. The insurer is responsible for the acts of its representatives and insurance producers, including those acts where the insurance producer has solicited, sold, or negotiated insurance on behalf of that insurer *prior to the date of appointment*.

(Emphasis added). Rasmussen contends that the language "prior to the date of appointment" implies that the legislature intended these statutes to apply retroactively. We disagree.

[¶38.]    According to SDCL 2-14-21, "[n]o part of the code . . . shall be construed as retroactive unless such intention plainly appears." Here, SDCL 58-30-176 provides that an insurer is responsible for the acts of its "insurance producers" even before appointment is established according to its terms. The statute does not imply that it and other statutes in the same section are to apply retroactively. Therefore, without an intention of retroactive application plainly appearing in the statutes or elsewhere, we decline to apply SDCL 58-30-142 retroactively.

[¶39.]     Even assuming these statutes do control and assuming Henkel would be considered an agent of North Star under SDCL 25-30-142, "[s]tatutes regulating licensing and defining agents, brokers and solicitors, are not intended to change or to exclude the general laws of agency." Boyter v. Blazer Const. Co., 505 So2d 854, 860 (LaApp 1987) (citing Tiner v. Aetna Life Ins. Co., 291 So2d 774, 777 (La 1974)); see also, Vina v. Jefferson Ins. Co. of New York, 761 P2d 581, 585 (UtahApp 1988) ("insurance code's purpose is 'primarily for the purpose of regulating insurance companies, agents, brokers, solicitors and adjusters' and does not supplant ordinary legal principles of agency") (quoting Farrington v. Granite State Fire Ins. Co., 232 P2d 754, 756 (Utah 1951)); Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 45:2 (3d ed 1996); Damon's Missouri, Inc. v. Davis, 590 NE2d 254, 258 (Ohio 1992).

[¶40.]     By the statute's own limitation, definitions supplied in SDCL 58-30-142 apply to "terms used in §§ 58-30-141 to 58-30-195, inclusive." This restricting language implies that the definitions provided were not to be construed to replace general laws of agency. Thus, definitions in the code should not, by themselves, resolve the agency question.

[¶41.]     Rasmussen also claims that whatever statutory scheme is applied is irrelevant because once the umbrella policy was issued to him in 1991, Henkel was North Star's agent for purposes of servicing that policy under both statutes. However, this Court has previously held that "a new policy is formed with respect to [ ] added property when the insured first procures insurance on real property not covered under a previous policy between the insured and the insurance company." Donalar Enterprises, Inc., 1998 SD 79, ¶37, 581 NW2d at 526.

[¶42.] Here, the Crownline was not covered under the existing umbrella policy; therefore, there was no existing policy on the boat that Henkel failed to service. Instead, any negligent act concerns procuring a new policy of insurance on the Crownline that was not already covered by the previous policy issued between Rasmussen and North Star. Even if Henkel was considered to be North Star's agent for purposes of the umbrella policy issued in 1991, that policy did not insure the Crownline which is the subject of this litigation. Thus, the issue presented to us is whether Henkel was North Star's agent for purposes of procuring umbrella coverage on the Crownline, not whether she was North Star's agent for purposes of servicing an existing policy.

[¶43.] This Court addressed a similar issue in 1894, noting that "respondent was engaged in the insurance business, as agent for numerous companies; but, as no particular company was mentioned as the one in which appellant's property was to be insured, it is quite evident that no company is liable . . . ." Lindsay v. Pettigrew, 5 SD 500, 59 NW 726, 727 (1894). In *Lindsay*, "[t]he money was paid, and the arrangement was consummated by which the insurance was to be procured, without any intimation as to the company in which the same was to be placed . . . ." *Id*. The Court held that the principal-agent relationship was between the insured and the agent when the agent took the insured's money under an express agreement to procure insurance and failed to secure the same or make an effort in that direction. *Id*.

[¶44.] In another case, this Court held that insurance solicitors held "the position of brokers or third parties participating in the negotiation of insurance"

when they had neither express nor ostensible authority to procure insurance with the insurer. *Fromherz v. Yankton Fire Ins. Co.*, 7 SD 187, 63 NW 784, 785 (1895). In *Fromherz*, the insured instigated the application and gave the soliciting agent an order to get insurance, agreeing to accept and pay for it if the policies and companies were satisfactory. *Id.* The insured contemplated the procuring of insurance in any company or companies whose policy would satisfy and be acceptable to insured. *Id.* The *Fromherz* Court held that although the soliciting agents promised to procure insurance, they did not promise for the insurer, for they had neither express nor ostensible authority to do so. *Id.* According to the Court, the insurer only became related to and a party to the transaction when it accepted the risk. *Id.*

[¶45.]     This Court has also stated that as a "general rule[,] [ ] if the insured authorizes an agent not only to insure but to keep the property insured, with power to select the insurer, and the agent then places the insurance in a company not represented by him, he is the agent of the insured . . . ." *Flanagan v. Sunshine Mut. Ins. Co.*, 73 SD 256, 258, 41 NW2d 761, 762 (1950) (citations omitted); *see also* Gen. Acc. Ins. Co. of Am. v. Am. Nat'l Fireproofing, Inc., 716 A2d 751, 756 (RI 1998) ("in instances in which an insurance agent represents several companies and has the freedom to choose the company with which he would place an insurance policy, the individual [is] the agent of the insured and not the insurer") (citation omitted); Electro Battery Mfg. Co. v. Commercial Union Ins. Co., 762 FSupp 844, 848 (EDMo 1991); *Damon's Missouri, Inc.*, 590 NE2d at 258-59.

[¶46.]     Further,

> [t]he broker . . . may be the agent of the insurer for a certain purpose and of the insured for another purpose. For example, the broker acts for the insured for the purpose of making the application and procuring the policy, and for the insurer for the purpose of collecting and remitting the premiums and delivering the policy.

*Electro Battery Mfg. Co.*, 762 FSupp at 848 (citation omitted). *See also Damon's Missouri, Inc.*, 590 NE2d at 260; Travelers Indem. Co. v. Nat'l Indem. Co., 292 F2d 214, 220 (8thCir 1961).

[¶47.]     "[W]hether an insurance broker is the agent of the insurer or of the insured depends on the facts of the particular case." *Electro Battery Mfg. Co.*, 762 FSupp at 848 (citing Schimmel Fur Co. v. Am. Indem. Co., 440 SW2d 932, 938 (Mo 1969)). Thus, the determination of whether a person is an agent would typically be a question for a fact finder. *See* Rumpza v. Larsen, 1996 SD 87, ¶24, 551 NW2d 810, 815. However, in this case, Henkel's capacity is a matter of law because the relevant facts are not in dispute. *See Damon's Missouri, Inc.*, 590 NE2d at 260; *Dodds*, 880 SW2d at 313 (citations omitted).

[¶48.]     It is undisputed that Henkel was not an exclusive agent for North Star. The evidence is uncontradicted that Henkel solicited policies of insurance from several other insurance companies. In fact, she had half a dozen insurance companies with which she could have acquired umbrella coverage and even had underlying coverage on the Crownline with another insurance company.

[¶49.]     Further, it was stipulated that when Rasmussen contacted Henkel to obtain insurance coverage on the boat, he expressed no preference with regard to any specific insurance company, specific type of insurance, i.e., liability or umbrella,

or amount of coverage. He merely contacted and informed her that he had purchased the Crownline. He relied upon her as his agent, as he had done numerous times in the past, to examine all possible sources of coverage and to procure insurance. Thus, Henkel was left to negotiate with various insurance companies and find the best deal. She was not restricted to offer a North Star policy at any time but could have acquired an umbrella policy with any of the six different companies with which she dealt.

[¶50.] Furthermore and importantly, Henkel did not have actual authority to bind North Star to an umbrella policy. Rasmussen knew that Henkel did not have authority to bind North Star, because it had rejected a policy proposed by Henkel for Rasmussen on a prior occasion. Rasmussen also had worked with Henkel in another agency business and was a life insurance agent himself. Thus, he understood the limits of her agency status.

[¶51.] On these undisputed facts, we conclude that Henkel was Rasmussen's agent for purposes of procuring insurance. Thus, any negligence in doing so is not imputed to North Star.

[¶52.] Affirmed.

[¶53.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.

[¶54.] MILLER, Retired Justice, sitting for SABERS, Justice, disqualified.